**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **KENDRIA DUBOIS,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **CASE NO. _____** |
| | § | |
| **CBSL AL MC CARE PROPERTIES** | § | |
| **LLC, CEDAR BLUFF ASSISTED** | § | **.** |
| **LIVING AND MEMORY CARE,** | § | |
| **FRONTIER MANAGEMENT LLC,** | § | |
| **JASPER OF MANSFIELD, AND** | § | |
| **SONIDA SENIOR LIVING, INC.,** | § | |
| | § | |
| *Defendants.* | § | |
| | § | |

---

### PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

---

TO THE HONORABLE DISTRICT COURT JUDGE:

Kendria Dubois, a former Resident Care Coordinator ("RCC") at Defendants' nursing facility, files this lawsuit. Ms. Dubois alleges that Defendants discriminated against her for her disabilities; discriminatorily non-selected her; failed to initiate an interactive process; failed to accommodate her; interfered with her FMLA rights; retaliated against her for her protected reports and FMLA leave; and discriminatorily and retaliatorily terminated her employment because of her disabilities and FMLA leave.

Ms. Dubois began working for Defendants in September 2023. In 2024, the Executive Director ("ED") and Health Services Director ("HSD") departed from their roles. Ms. Dubois covered their duties, in addition to her own. She then applied for the ED role. Defendants non-selected Ms. Dubois due to her disabilities and selected someone without disabilities.

Ms. Dubois has had multiple sclerosis, pseudotumor cerebri, hypertension, and migraines for years. Her disabilities were well managed. Unfortunately, Ms. Dubois's conditions materially worsened, coinciding with Defendants' unrelenting demands of her at the facility. Throughout Ms. Dubois's employment, Defendants foisted all coverage and on-call responsibilities on her.

Ms. Dubois was often deprived of enjoying two scheduled days off per week. Instead, she frequently worked seven days a week, recurrently on double shifts. She was expected to remain on call and available to address any & all concerns 24/7—all for $45,990 a year. Defendants exploited Ms. Dubois's managerial title, knowing it exempted her from overtime.

Defendants' facility needed more workers. Notwithstanding, Defendants failed to complete hiring processes, despite Ms. Dubois's efforts; eventually admonished her when subordinates covered shifts for overtime pay; and proscribed her from hiring staffing agency workers for coverage. These options would cost Defendants money. Ordering Ms. Dubois to do it was free. Ms. Dubois diligently continued performing all expectations of her role. However, her disabilities reached a breaking point in the meantime.

In November and December of 2024, Ms. Dubois's physician requested intermittent FMLA leave and a leave period into January 2025. Defendants interfered with Ms. Dubois's requests to effectuate her FMLA leave. Once it was approved, Defendants still contacted her incessantly for work. Upon her return, Defendants initiated a campaign of discrimination and retaliation against her, seeking to manufacture reasons for termination. In May 2025, the new HSD disclosed to Ms. Dubois that Defendants were "out to get [her]" due to "attendance." By June 2025, Defendants unlawfully discarded Ms. Dubois as a result of her disabilities and need for FMLA leave. Defendants' reasons for termination are transparently false and pretextual.

## I.   PARTIES, JURISDICTION, AND VENUE

1.   Plaintiff Kendria Dubois is an individual who resides in Tarrant County, TX.

2.   Defendant CBSL AL MC Care Properties LLC is a corporation doing business in Texas. It may be served with process through its registered agent, Business Filings Incorporated, located at 701 Brazos Street, Ste. 720, Austin, TX 78701.

3.   Defendant Cedar Bluff Assisted Living & Memory Care is a corporation doing business in Texas. It may be served with process through its registered agent, Business Filings Incorporated, located at 701 Brazos Street, Ste. 720, Austin, TX 78701.

4.   Defendant Frontier Management LLC is a corporation doing business in Texas. It may be served with process through its registered agent, Business Filings Incorporated, located at 780 Commercial St. SE, Ste. 100, Salem, OR.

5.   Defendant Jasper of Mansfield is a corporation doing business in Texas. It may be served through its registered agent, David Brickman at 16301 Quorum Dr., Ste. 160a, Addison, TX 75001.

6.   Defendant Sonida Senior Living is a corporation doing business in Texas. It may be served through its registered agent, David Brickman at 16301 Quorum Dr., Ste. 160a, Addison, TX 75001.

7.   This Court has jurisdiction to hear the merits of these claims under 28 U.S.C. § 1331, as Ms. Dubois asserts claims under the Americans with Disabilities Act Amendments Act of 2008 and the Family and Medical Leave Act.

8.   Venue is appropriate under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this lawsuit occurred within the Northern District of Texas.

## II.  EXHAUSTION OF ADMINISTRATIVE REMEDIES

9. Plaintiff timely filed Charges of Discrimination with the Equal Employment Opportunity Commission.

10. Plaintiff files this Complaint within 90 days of receiving notices of right to sue from the EEOC.

11. All conditions precedent to the bringing of the suit have been satisfied or fulfilled.

## III.  FACTS

### The Start of Ms. Dubois's Employment

12. Ms. Dubois first began working for Defendants in September 2023 as the Resident Care Coordinator ("RCC").

13. Ms. Dubois was a dedicated RCC who worked diligently to ensure that all residents were well managed.

14. Ms. Dubois is a person with disabilities.

15. Her disabilities include hypertension, migraines, multiple sclerosis, pseudotumor cerebri, and diverticulosis.

16. At the time of her onboarding, Ms. Dubois disclosed all her then-present conditions to Defendants.

17. Her conditions had been well managed for years.

18. From the time of Ms. Dubois's hiring, Ms. Dubois was expected to provide coverage for all call-ins and all vacant shifts and to be on duty at all times.

19. These were responsibilities to be shared between the Executive Director ("ED"), the Health Services Director ("HSD"), and RCC.

20. Unfortunately, that was never the case.

21. Her second-line supervisor, ED Peyton Iman, never covered any shifts and never managed on-call duties.

22. Her first-line supervisor, HSD Ruby Joe, had others cover shifts for her and provided overtime or off days to them.

23. When it came to on-duty calls, Ms. Joe refused to answer calls after she went home for the day.

24. Thus, Ms. Dubois shouldered all coverage issues and on-duty time.

25. In or around March 2024, HSD Joe stopped coming to work.

26. Ms. Dubois, who was third in command, was abruptly expected to cover all the HSD's duties, in addition to her own.

27. In or around May 2024, Brandy (last name unknown), Defendants' Regional Nurse, came to Defendants' facility.

28. Ms. Brandy came to perform trainings, address care plans, and to do a walk through.

29. She also audited the med carts and inspected the facility overall.

30. During this inspection, Ms. Dubois and Ms. Brandy discussed errors with the narcotics books, among other things.

31. At the end of their conversation, Ms. Brandy advised that Ms. Dubois could contact her regarding any workplace concerns.

32. Later in or around May 2024, Ms. Dubois reached out to Ms. Brandy & requested a call.

33. Ms. Dubois reported that she was being overworked; that the ED and HSD were failing to take on-call duties and provide coverage for shifts; that Ms. Dubois was being expected to perform others' duties, in addition to her own; and that HSD Joe was failing to address a med tech's improper narcotics administration.

34. Ms. Brandy advised that she would promptly inform Regional Vice President Carrol Bishop of Ms. Dubois's concerns.

35. Ms. Dubois never heard back from anyone on any of her reports or concerns.

36. Soon thereafter, in or around July 2024, ED Iman, also left the facility.

37. Defendants expected Ms. Dubois to cover all his duties, too.

38. At times, Ms. Dubois worked seven days a week for the Defendants.

39. Frequently, she was expected to work more than one shift per day to provide coverage.

**Discriminatory Non-Selection**

40. In or around July 2024, Ms. Dubois applied for the Executive Director role.

41. The Defendants denied her a chance to interview, elected not to offer the certification course to her during her time as interim ED, and selected someone else.

42. Ms. Dubois was discriminatorily non-selected, despite proficiently providing coverage for the role after ED Iman's departure.

43. In August 2024, the Defendants hired Valecia Bullock to be the Executive Director.

44. Upon information and belief, at the time of her hiring, Ms. Bullock was not known to be a person with disabilities.

**Executive Director's Mismanagement &
Defendants' Abusive Employment Practices**

45. Executive Director ("ED") Bullock's management was unacceptable.

46. Assisted living residents complained that the ED never returned their phone calls or their family members'.

47. Residents also complained that ED Bullock ordered residents and/or their family members to schedule an appointment to meet with the ED.

48. This was the case even when they approached her at the front desk and she was obviously available for a brief conversation.

49. As ED, Ms. Bullock was also supposed to provide coverage for shifts along with Ms. Dubois.

50. Instead, she foisted all responsibility on Ms. Dubois to cover shifts, just as ED Iman had done.

51. Despite Ms. Dubois's prior report of this misconduct, Defendants did nothing to address or correct the behavior.

52. If Ms. Dubois had just performed two shifts, Ms. Bullock would still order Ms. Dubois to provide coverage on the very next day.

53. There were times when Ms. Dubois had no off days at all because of Defendants' extreme expectations.

54. Ms. Dubois began experiencing heightened symptoms from her disabilities.

55. This coincided with Defendants' relentless demands for her availability and coverage.

56. When Ms. Dubois's staff saw her suffering, they would offer to provide coverage for one another's shifts.

57. While this worked for some time, management eventually confronted Ms. Dubois about overtime paid out to her subordinates.

58. The Defendants expected Ms. Dubois to perform the work of multiple people—knowing that they did not have to pay her a penny extra for overtime.

59. Moreover, Defendants never allowed Ms. Dubois to hire staffing agency workers for coverage, despite her requests.

60. ED Bullock refused to offer coverage herself, despite knowing that staffing agency workers and overtime for existing workers were not available options.

61. Defendants subjected Ms. Dubois to untenable working conditions and set her up for failure.

62. Still, Ms. Dubois remained steadfast and diligent.

63. She sacrificed her life outside of work to keep her income and continue providing great service for Defendants' residents and management for Defendants' workers.

64. In addition to foisting all shift coverage onto Ms. Dubois, Ms. Bullock also ordered her to manage and perform tasks that were the ED's responsibility solely or at least in part.

65. This included managing care plans and being the only manager on duty every single day and night.

66. Ms. Dubois had to take calls at every hour of the day and night for anything pertaining to staff or resident care.

67. Ms. Dubois had attempted to address these serious concerns with Defendants before.

68. Unfortunately, Defendants did not address or correct these issues.

69. Thus, Defendants made clear to Ms. Dubois that Defendants would not intervene on her behalf or provide support for on-call or coverage duties.

## Defendants Hire a New HSD

70. Defendants never assigned or offered any interim respite for Ms. Dubois, despite knowing there was no HSD on site.

71. Even when there was an HSD, the HSD never took on-call duties.

72. In October 2024, Ms. Bullock hired a new HSD, Joni (last name unknown).

73. Even after Joni's arrival, Ms. Dubois continued to perform many of Joni's duties.

74. Joni did not understand scheduling, for example.

75. Ms. Dubois still had to manage scheduling and continued to be the only manager on call.

76. HSD Joni thankfully did offer coverage during the short time she worked for Defendants.

**ED Bullock Lies to Regional Vice President**

77. In or around mid-October 2024, the Regional Vice President, Carrol Bishop, came to the site.

78. She instructed Ms. Bullock to share the weight of on-call work and floor coverage.

79. Ms. Bullock had never shared these responsibilities with Ms. Dubois.

80. Ms. Bullock immediately lied to Ms. Bishop and stated that she had taken on-call responsibilities for a month.

81. Ms. Bullock had never done this.

82. Ms. Bullock never answered calls from staff and would tell them to only contact her for emergencies.

83. Staff still had to call Ms. Dubois for any questions or concerns.

84. Ms. Bullock was also required to do "pop-ups" for overnight shifts, along with the HSD and RCC.

85. Upon information and belief, only Ms. Dubois ever performed a "pop-in."

86. Indeed, despite being disabled, Ms. Dubois never failed to perform her duties.

87. Meanwhile, Defendants shirked material responsibilities onto her.

**Ms. Dubois's Health Conditions & Defendants Failure to Initiate an Interactive Process for Reasonable Accommodations**

88. Ms. Dubois's conditions had been well managed for years.

89. As Defendants demanded virtually non-stop work with no additional pay, Ms. Dubois experienced a marked decline in her health.

90. Ms. Dubois eventually struggled to walk, as her MS was now sending what felt like electricity going through her legs.

91. Defendants were aware of this.

92. She had excruciating, severe migraines more frequently as well, and things continued to get worse.

93. Ms. Dubois always kept Defendants informed of her health concerns and appointments.

94. Nonetheless, Defendants never initiated any interactive process or discussion of reasonable accommodations to offer her support.

95. Defendants could have easily provided additional staff, either by effectuating hiring, allowing for existing workers to obtain overtime, and/or by allowing staffing agency workers in.

96. Defendants were affirmatively aware of all Ms. Dubois' conditions and could visibly see that she was struggling to walk and fighting migraines.

97. Defendants were aware of at least some obvious reasonable accommodations available.

98. Defendants never raised or explored other possible accommodations for Ms. Dubois.

### Ms. Dubois Requests FMLA Leave

99. In November 2024, Ms. Dubois met with a physician who observed fluid collecting in and around her brain.

100.    Ms. Dubois's stress levels caused pressure in her head, resulting in fluid collection.

101.    This resulted in more severe migraines and blurred vision.

102.    Her physician sent a letter to the Defendants requesting intermittent FMLA leave on or about November 16, 2024.

103.    Ms. Dubois shared the FMLA request with the ED, Business Office Manager, Jamie Brewster, the HSD, and the corporate regional HR Representative, Jean Ciminna.

104.    They did not understand her conditions and questioned the severity of them, so Ms. Dubois shared her x-rays with the team.

105.    Among other things, Ms. Dubois explained that pseudotumor cerebri was a chronic illness.

106.    Ms. Dubois was approved for intermittent FMLA.

107.    However, within just 3 days of receipt of Ms. Dubois's intermittent FMLA letter, Defendants fabricated an allegation against Ms. Dubois—and presumably placed it into her personnel file.

108.    Defendants claimed that Ms. Dubois received "ethic point complaints" from staff about her alleged failure to ensure adequate personnel were scheduled.

109.    Ms. Dubois was never informed of any such complaints until after she filed EEOC Charges.

110.    Ms. Dubois was never informed of what "ethic point complaints" were.

111.    When workers called in the same day of a shift, as one worker did on November 19, 2024, Ms. Dubois had to scramble to find coverage.

112.    Ms. Dubois always immediately addressed shift coverage.

113.    Coverage issues were, in part, a result of Defendants' failure to effectuate hiring, despite Ms. Dubois's extensive efforts to identify applicants and get them in for interviews.

114.    Additionally, Defendants' refusal to allow for overtime or staffing agency coverage exacerbated the existing staffing shortages.

115.    It was not a failure on Ms. Dubois's part, as Defendants now self-servingly and falsely claim.

116.    While Ms. Dubois's daily work demands continued, her hypertension worsened.

117.    Her numbers became so high and uncontrollable that, on or about December 2, 2024, Ms. Dubois visited a cardiologist.

118.    She was ordered to do a stress test and echocardiogram.

119.    By the end of her appointment, her doctor added a third blood pressure medication to her list.

120.    He also advised that she reduce her stress at work.

121.    As Ms. Dubois's conditions worsened, she sought to avail herself of her approved intermittent leave.

122.    Ms. Bullock would become upset and immediately question Ms. Dubois about coverage.

123.    Defendants discouraged Ms. Dubois from taking intermittent time out.

124.    When she did, she was still expected to continue working during her leave.

125.    In early December 2024, Ms. Dubois arrived at the facility one morning but had to rush herself to the emergency room across the street instead.

126.    Thereafter, she requested a period of FMLA leave from December 2024 to January 2025.

**Defendants Initiate a Campaign of Discrimination, Interference & Retaliation**

127.    Defendants interfered with Ms. Dubois's access to FMLA leave paperwork and approval, despite her repeated follow-ups for many days.

128.    Eventually, she was approved.

129.    During her time out, she was hospitalized for a week in the ICU.

130.    While Ms. Dubois was out on FMLA leave, she was *still* receiving work calls.

131.    Defendants asked her to work on myriad issues, from scheduling to login clarification, care plans, and resident issues.

132.    Her subordinates were contacting her, too, as the ED and HSD failed to answer their calls.

133. Defendants failed to instruct facility workers not to contact Ms. Dubois while she was out.

134. In fact, Ms. Bullock expressly advised the facility workers to only contact Ms. Bullock in case of emergencies.

135. Ms. Bullock did not consider call-ins and other daily concerns as emergencies, thus leaving the workers with no choice but to contact Ms. Dubois while she was out on FMLA leave.

136. Every September, Ms. Dubois's PTO time renewed, as she began in September 2023.

137. Back in September 2024, Ms. Dubois had logged into her employee portal to confirm that her renewed 80 hours of PTO had been added.

138. At that time, she promptly requested 48 hours of time off for Mardi Gras in February 2025.

139. This time off request was approved.

140. However, when Ms. Dubois went out on FMLA leave in December 2024, she was retaliatorily never paid out for the PTO balance of 32 hours.

141. In January 2025, Ms. Dubois returned back to the facility.

142. She learned that HSD Joni had resigned after just two months, leaving the facility in December 2024.

143. Ms. Dubois was once again expected to be on-call 24/7 and to provide coverage for all shifts.

144. Ms. Dubois continued diligently working for Defendants.

145. Soon after Ms. Dubois returned in January 2025, she noticed that Defendants had retaliatorily rescinded approval for her upcoming Mardi Gras PTO in February 2025.

146. Defendants instead approved Ms. Bullock for Mardi Gras PTO that same week.

147. If Ms. Dubois had 48 additional hours of PTO, this should have been applied to her December to January 2025 FMLA period.

148. Instead, she never received that pay at all.

149. Ms. Dubois followed up with BOM Brewster multiple times on what had happened with her PTO.

150. Ms. Dubois never heard back from anyone on her PTO.

151. Within weeks of her return from FMLA leave, Defendants almost immediately retaliated by issuing a false February 2025 disciplinary action against her.

152. On or about February 11, 2025, Defendants' scanner glitched, resulting in residents' family members errantly receiving information pertaining to unaffiliated residents.

153. Ms. Dubois showed Carrol Bishop on Ms. Dubois's laptop how she had correctly sent the emails out individually to each family, with a CC to herself.

154. Ms. Bishop advised Ms. Dubois to head home on "suspension" while Ms. Bishop spoke with Ms. Ciminna over the phone about the incident.

155. Within 45 minutes, Ms. Bullock called Ms. Dubois to come right back to work.

156. Defendants had immediately reversed the purported suspension, upon learning that Ms. Dubois had done nothing to cause the incident.

157. Nonetheless, at the EEOC, Defendants pretextually and falsely cited to this incident as a justification for its eventual discriminatory and retaliatory termination.

## Ms. Dubois Receives Another Diagnosis

158. On March 14, 2025, Ms. Dubois was covering a medical tech's night shift, from 10:00 p.m. to 6:00 a.m.

159. She went into the shift in pain but knew that she could not call in because Defendants never provided back-up coverage at any point.

160. She began vomiting and passing blood just past midnight; she was in excruciating pain.

161. She messaged ED Bullock and HSD Miranda and asked for back-up in the event they were still awake.

162. Ms. Dubois called subordinates as well, but no one answered the phone.

163. Finally, when her shift ended at 6:00 a.m., she went straight to the ER.

164. She was diagnosed with diverticulosis.

165. Defendants were always kept abreast of her escalating symptoms and conditions.

166. Still, at no point in time during the entire course of Ms. Dubois's employment did Defendants ever attempt to initiate an interactive process or seek to accommodate her.

**Defendants Discriminatorily and Retaliatorily Threaten Ms. Dubois's Employment**

167. On May 14, 2025, Ms. Dubois had to provide coverage for someone else, such that she worked two shifts that day.

168. Thus, on May 15, 2025, she was scheduled to be off, as she had worked through the night of May 14.

169. On May 15, 2025, HSD Miranda contacted the other managers at 8:30 a.m., stating that she had an appointment at 9:00 a.m. and would be late.

170. Later that day, Ms. Dubois learned that Ms. Miranda did not show up to work at all.

171. All the employees were calling Ms. Dubois with questions and concerns, after she had just worked two shifts back-to-back.

172. That same afternoon, Ms. Miranda called Ms. Dubois to discuss some resident concerns.

173. She then accused Ms. Dubois of claiming to be sick just so that she could spend time with her partner.

174. Ms. Dubois was not out due to sickness.

175. She was out because she had just worked two full shifts into the night.

176. After everything that Ms. Dubois had done for the Defendants, she could not believe HSD Miranda's accusation.

177. It was also coming from someone who had failed to show up for her normal, scheduled workday at all.

178. HSD Miranda then asserted that "they" were out to get Ms. Dubois for her "attendance."

179. This was a clear threat of FMLA retaliation meant to discourage Ms. Dubois from taking intermittent leave or a period of leave.

180. When Ms. Dubois asked for clarification on who "they" referred to, Ms. Miranda would not answer.

181. Ms. Dubois responded by explaining that she had no control over whatever the Defendants wanted to do.

182. She reminded HSD Miranda that the Defendants were fully aware of her myriad conditions.

183. Ms. Miranda deflected and stated that she "understood the dynamics of being with a truck driver."

184. Ms. Dubois immediately knew that Ms. Miranda had been speaking about Ms. Dubois and her relationship with ED Bullock.

185. Only Ms. Bullock was aware that Ms. Dubois's partner was a truck driver.

186. This suggested that it was Ms. Bullock who was discussing Ms. Dubois's FMLA leave with Ms. Miranda and making threats about her FMLA leave.

187. Next, Ms. Miranda threatened that Ms. Dubois needed to "watch" her intermittent time out because this job was Ms. Dubois's main source of income.

188. Ms. Miranda lodged discriminatory and retaliatory threats on Ms. Dubois's employment because of Ms. Dubois's disabilities and FMLA leave.

189. Ms. Miranda was affirmatively aware of Ms. Dubois's disabilities.

190. Ms. Dubois had expressly informed her of them multiple times.

191. Ms. Miranda was also affirmatively aware of Ms. Dubois's intermittent FMLA and leave period.

192. Abruptly, during their phone call, Ms. Dubois heard an automated message indicating that the phone call was being recorded.

193. Ms. Dubois was stunned.

194. Ms. Miranda was recording a work-related conversation with Ms. Dubois, presumably to obtain jeopardizing information.

195. Ms. Dubois asked Ms. Miranda if she was recording her.

196. Ms. Miranda hung up the phone.

197. Ms. Dubois was disturbed by Ms. Miranda's accusations and secret recording.

### Ms. Dubois Makes Protected Reports to HR

198. She contacted HR Director, Jean Ciminna, the same day.

199. Ms. Dubois described the entire call with Ms. Miranda.

200. Ms. Dubois also reported Ms. Miranda's discriminatory and retaliatory accusations and comments regarding her disability-related illnesses.

201. She also expressly informed Ms. Ciminna that Ms. Miranda threatened Ms. Dubois regarding her call-ins for leave.

202. HR Director Ciminna evaded substantively responding to Ms. Dubois's protected reports altogether, despite multiple follow-ups from Ms. Dubois.

203. Indeed, Ms. Dubois did not hear back from Ms. Ciminna until after Ms. Dubois's unlawful termination.

204. On May 16, 2025, Ms. Dubois emailed Ms. Bullock and asked for a meeting to discuss her call with the HSD.

205. This meeting was scheduled on May 23, 2025.

206. When Ms. Dubois confronted Ms. Bullock about Ms. Miranda's claim that the Defendants were out to get Ms. Dubois due to her attendance, Ms. Bullock replied that they couldn't do that because of Ms. Dubois's FMLA.

207. ED Bullock asked Ms. Dubois if Ms. Dubois had shared her condition with the HSD.

208. Ms. Dubois confirmed that she had.

209. It was not a secret. Ms. Dubois was out on FMLA for her disabilities when Ms. Miranda first started, and Ms. Dubois openly shared her disability concerns with her superiors and colleagues.

## Ms. Dubois's Termination of Employment

210. In May 2025, Ms. Dubois requested bereavement leave for May 16 and 17, 2025.

211. She had had a death in the family, and the funeral was in Louisiana on May 17, 2025.

212. Bereavement was normally 7 days. Ms. Dubois only asked for two days of bereavement: Friday, May 16 and Saturday, May 17.

213.     Her normal weekend days were on Sundays and Mondays, so she planned to remain in Louisiana on May 18 and return to work on Tuesday, May 19 for a night shift.

214.     On the day of the funeral, Ms. Dubois received a text message from Regional Vice President Gwen Davis, the ED, and the HSD.

215.     In the message, the Regional VP asserted that many assessments needed to be done at the facility and requested support.

216.     Ms. Dubois contacted VP Davis separately to apprise her that she was out on bereavement.

217.     Ms. Davis did not respond.

218.     The ED contacted Ms. Dubois and asked that she return to work on Monday, Ms. Dubois's scheduled day off.

219.     Ms. Dubois replied that she could not, as she was already scheduled to be in Louisiana until the end of her weekend.

220.     Ms. Bullock stated that Ms. Davis had asked Ms. Bullock to ask Ms. Dubois to come back early.

221.     Ms. Dubois had worked far more than her fair share for the Defendants.

222.     She was even willing to take only 2 of her 7 days of bereavement.

223.     Still, the Defendants sought to deprive her of even more time and held her to a discriminatorily and retaliatorily different standard.

224.     On or about June 5, 2025, HSD Miranda contacted Ms. Dubois for a meeting with the HSD and ED.

225.     Ms. Dubois was shell-shocked to learn that she was being terminated.

226. At the time, the manufactured, pretextual reasons for termination were: that she had failed to perform tuberculosis screenings; failed to gather information for the state's assessments; and failed to put schedules out in a timely manner.

227. None of these accusations were based in reality.

228. Tuberculosis screenings for the new hires were squarely within the HSD's job description, not Ms. Dubois's.

229. Next, Ms. Dubois was the only one who knew where many of the files were.

230. Indeed, she is the person who had gone to the storage closet to obtain documents for the state.

231. State had asked for additional files multiple times after Ms. Dubois had retrieved the last set requested.

232. Each time Ms. Dubois retrieved a set of files, she had to give the BOM or ED their keys back.

233. Only they had keys to the closet in which the files were retained.

234. Ms. Dubois continued with her work in between each request, but she never failed to address each request.

235. Finally, Ms. Dubois always put the schedules together.

236. Once Ms. Dubois sent schedules out, several individuals would come forward indicating that they had apprised Ms. Bullock or Ms. Miranda of upcoming days off.

237. Ms. Bullock and Ms. Miranda failed to relay this information to Ms. Dubois.

238. Yet, they were now pinning their failures on Ms. Dubois.

239. Apart from these purported reasons for termination, Defendants manufactured myriad other, new reasons for termination at the EEOC level.

240. The real reasons for Ms. Dubois's termination were unlawful discrimination and retaliation.

241. Despite the ED's and the HSD's unacceptable performances and shirking of responsibilities to Ms. Dubois, only Ms. Dubois was terminated.

242. The Defendants unlawfully discriminated against Ms. Dubois for her disabilities; discriminatorily non-selected her; discriminatorily failed to initiate an interactive process; failed to accommodate her disabilities; interfered with her FMLA rights; retaliated against her for her protected reports and FMLA leave; and discriminatorily and retaliatorily terminated her employment due to her disabilities and FMLA leave.

## IV.   DISABILITY DISCRIMINATION, IN VIOLATION OF THE TEXAS LABOR CODE & THE ADAAA

243. Plaintiff realleges and incorporates the statements and allegations in the aforementioned paragraphs as if fully stated herein.

244. Defendants are employers under Chapter 21 of the Texas Labor Code and the ADAAA.

245. Plaintiff has disabilities under Chapter 21 of the Texas Labor Code and the ADAAA.

246. Defendants were affirmatively aware of Plaintiff's disabilities.

247. As described above, Defendants' actions constitute unlawful discrimination on the basis of Plaintiff's disabilities. Defendants' actions are in violation of the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. § 12101, *et seq.*, and the Texas Labor Code.

248. Plaintiff suffered adverse employment actions when Defendants discriminatorily disciplined and ultimately terminated Plaintiff's employment because of her disabilities.

249. The employment practices complained of above were intentional.

250. Defendants' actions have caused Plaintiff to suffer damages within the jurisdictional limits of this Court.

## V.  DISCRIMINATORY NON-SELECTION, IN VIOLATION OF THE ADAAA & TEXAS LABOR CODE

251. Plaintiff realleges and incorporates the statements and allegations in the aforementioned paragraphs as if fully stated herein.

252. As described above, Defendants, aware of Plaintiff's disabilities, non-selected her for the role of Executive Director.

253. Nonetheless, Defendants expected her to perform all aspects of the ED role, which she successfully did.

254. Defendants declined to interview her for the role.

255. Then, Defendants hired a person without disabilities at the time of her hiring.

256. Defendants' actions are in violation of the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. § 12101, *et seq*., and the Texas Labor Code.

257. The employment practices complained of above were intentional.

258. Defendants' actions have caused Plaintiff to suffer damages within the jurisdictional limits of this Court.

## VI.  FAILURE TO INITIATE OR ENGAGE IN AN INTERACTIVE PROCESS, IN VIOLATION OF THE ADAAA & TEXAS LABOR CODE

259. Plaintiff realleges and incorporates the statements and allegations in the aforementioned paragraphs as if fully stated herein.

260. As described above, Defendants expected Plaintiff to cover all shifts and on-call duties, without effectuating hiring and while discouraging and proscribing overtime and staffing agency coverage.

261. As Defendants' unacceptable expectations of Plaintiff's duties continued, her health conditions materially worsened. Defendants were aware of this.

262.    Despite being able to hire additional staff or allowing for staffing agency workers or overtime for existing workers, Defendants elected not to do so.

263.    These could have easily been accommodations available to Plaintiff, along with myriad other options, which were never explored.

264.    Defendants failed to initiate any interactive process of how to accommodate Plaintiff's deteriorating health conditions. Defendants were affirmatively aware of her conditions and subsequent ICU and ER hospitalizations.

265.    Defendants' actions are in violation of the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. § 12101, *et seq*., and the Texas Labor Code.

266.    The employment practices complained of above were intentional.

267.    Defendants' actions have caused Plaintiff to suffer damages within the jurisdictional limits of this Court.

## VII.    FAILURE TO ACCOMMODATE, IN VIOLATION OF THE ADAAA & TEXAS LABOR CODE

268.    Plaintiff realleges and incorporates the statements and allegations in the aforementioned paragraphs as if fully stated herein.

269.    As described above, Defendants expected Plaintiff to cover all shifts and on-call duties, without effectuating hiring and while discouraging and proscribing overtime and staffing agency coverage.

270.    As Defendants' unacceptable expectations of Plaintiff's duties continued, her health conditions materially worsened. Defendants were aware of this.

271.    Despite being able to hire additional staff or allowing for staffing agency workers or overtime for existing workers, Defendants elected not to do so.

272. These could have easily been accommodations available to Plaintiff, along with myriad other options, which were never explored.

273. Defendants failed to accommodate Plaintiff's disabilities, even with obvious accommodations.

274. Defendants were aware of Plaintiff's deteriorating health conditions and ICU and ER hospitalizations.

275. As described above, Defendants' actions constitute unlawful discrimination on the basis of Plaintiff's disabilities. Defendants' actions are in violation of the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. § 12101, *et seq.*, and the Texas Labor Code.

276. The employment practices complained of above were intentional.

277. Defendants' actions have caused Plaintiff to suffer damages within the jurisdictional limits of this Court.

## VIII.   RETALIATION IN VIOLATION OF THE ADAAA & TEXAS LABOR CODE

278. Plaintiff re-alleges and incorporates the allegations contained in the above paragraphs as if fully stated herein.

279. As described above, Defendants' actions constitute unlawful retaliation on the basis of Plaintiff's protected reports regarding her disabilities, in violation of the ADAAA and TLC.

280. The employment practices complained of above were intentional.

281.  Plaintiff engaged in activities protected under federal and state law when she complained of discrimination.

282. Defendants subjected Plaintiff to adverse employment actions by disciplining and terminating her in retaliation for her protected activity.

283. Because of the actions of Defendants, Plaintiff has suffered damages within the jurisdictional limits of this Court.

### IX.    FMLA INTERFERENCE

284. Plaintiff realleges and incorporates the statements and allegations in the aforementioned paragraphs as if fully stated herein.

285. Defendants' actions constitute unlawful interference with Plaintiff's protected use of FMLA leave, in violation of the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq*.

286. The employment practices complained of above were intentional.

287. Defendants were Plaintiff's "employer" as defined by the FMLA.

288. Defendants engaged in commerce or in an industry or activity affecting commerce and employed 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year.

289. At all times relevant to the issues in this lawsuit, Plaintiff was Defendants' employee.

290. Plaintiff was employed for at least 12 months or 1,250 hours of service during the 12 months preceding her requests for intermittent FMLA leave and FMLA leave.

291. Plaintiff was entitled to take intermittent FMLA leave and FMLA leave.

292. Defendants interfered with Plaintiff's right to take intermittent and FMLA leave, including by incessantly delaying and ignoring Plaintiff's requests for documentation and approval. Defendants also interfered by incessantly expecting her to work while she was out and discouraging Plaintiff from taking leave, including an express threat that "they were out to get [her]" and that she needed to "watch" her time out.

293.   As a direct and proximate result of Defendants' interference with Plaintiff's right to FMLA leave, Plaintiff was unlawfully terminated from her employment soon after she began availing herself of leave.

294.   Because of the actions of Defendant, Plaintiff has suffered damages within the jurisdictional limits of this Court.

## X.   FMLA RETALIATION

295.   Plaintiff realleges and incorporates the statements and allegations in the aforementioned paragraphs as if fully stated herein.

296.   Defendants' actions constitute unlawful retaliation for Plaintiff's protected use of FMLA leave, in violation of the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq*.

297.   The employment practices complained of above were intentional.

298.   As a direct and proximate result of Defendants' retaliation, Defendants expected her to work while she was on leave, immediately prepared disciplinary actions for her, manufactured additional disciplinary actions for her personnel file, threatened her for "attendance" issues, threatened that she needed to "watch" her time out, and ultimately terminated her employment.

299.   Because of the actions of Defendant, Plaintiff has suffered damages within the jurisdictional limits of this Court.

## XI.   JURY DEMAND

300.   Plaintiff demands trial by jury on all issues, claims, actions, and defenses and will tender the appropriate fee.

## XII.   PRAYER

301.   Plaintiff seeks all damages allowed pursuant to the ADAAA, Texas Labor Code, and the FMLA, including:

    a.   Judgment against Defendants ordering them to take such reasonable actions as may be necessary to remedy the effects of their violations of the ADAAA, TLC, and FMLA, including injunctive relief, such as ordering the Defendants to conduct trainings on discrimination and retaliation;

    b.   Judgment against Defendants for lost wages and benefits, both back pay, front pay, and lost economic opportunity;

    c.   Judgment against Defendants for compensatory damages, including emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

    d.   Judgment against Defendants for incidental and consequential damages and liquidated damages;

    e.   Judgment against Defendants for punitive damages because Defendants' actions were intentional, committed with malice, and/or made with a reckless disregard for Plaintiff's statutory rights;

    f.   Pre-judgment interest at the maximum legal rate on all amounts awarded;

    g.   Interest after judgment at the maximum legal rate on all amounts awarded until paid in full;

    h.   Judgment against Defendants for Plaintiff's reasonable attorneys' and experts' fees;

    i.   Costs of suit; and

    j.   Such other and further relief to which Plaintiff may justly be entitled.

302.    WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully prays that Defendants

be cited to appear, that upon a trial on the merits, Plaintiff be awarded damages sought herein,

and for such other and further relief to which Plaintiff is justly entitled.

Respectfully submitted,
/s/ Rachel Bethel
Rachel Bethel
Texas Bar No. 24133095

Robert J. Wiley
Texas Bar No. 24013750
*Board Certified Specialist, Texas Board of Legal*
*Specialization, Labor and Employment Law*

2613 Thomas Avenue
Dallas, TX 75204
Telephone: (214) 528-6500
Facsimile: (214) 528-6511
rbethel@robwiley.com
ATTORNEYS FOR PLAINTIFF